UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO CASUALTY
CO.,

                              Plaintiffs,

          –against–

APEX SPINE & ORTHOPAEDICS, PLLC, ERIK T.
BENDIKS, M.D., ADVANCED PAIN
CONSULTANTS, P.A., and SONIA P. PASI, M.D.,

                           Defendants.

Docket No.: _____( )

**Plaintiffs Demand
a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1. This action seeks to recover more than $2,800,000.00 in damages sustained by Plaintiffs as the result of the Defendants' submission of hundreds of fraudulent and unlawful medical bills and reports through Apex Spine & Orthopaedics, PLLC ("Apex Spine") and Advanced Pain Consultants, P.A. ("Advanced Pain") for purported examinations, electrodiagnostic ("EDX") testing, pain medications, urinalysis/drug testing, diagnostic imaging, pain management injections, and related healthcare services (collectively the "Fraudulent Services").

2.     The Fraudulent Services were provided, to the extent that they actually were provided, to individuals ("Claimants") who claimed to have been involved in automobile accidents and were asserting claims against GEICO insureds' insurance policies.

3.     As set forth herein, the fraudulent scheme enriched the Defendants by exploiting two common claims scenarios, namely:

(i)     bodily injury ("BI") claims, made by Claimants who were not substantially at fault for automobile accidents, to the insurance companies of the individuals who were substantially at fault for such accidents ("At-Fault Drivers"), in which the Claimants sought to recover for economic losses including medical expenses, as well as for non-economic losses such as pain and suffering; and

(ii)    underinsured/uninsured motorist ("UM") claims, made by Claimants to their own insurance companies, if their recoveries under BI Claims from the At-Fault Drivers' insurance companies were insufficient to compensate the Claimants for their economic and non-economic losses as a result of the underlying accidents.

4.     The Defendants purported to provide the Fraudulent Services to the Claimants so that the resulting bills and reports could be included in the Claimants' insurance payment demands ("Demands") to GEICO and other insurers, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby wrongfully enrich the Defendants and their associates.

5.     The Defendants are as follows:

(i)     Defendant Apex Spine is a North Carolina medical professional limited liability company through which many of the Fraudulent Services purportedly were provided to Claimants, and was used as a vehicle to generate fraudulent bills and treatment reports so that they could be submitted as a part of and in support of fraudulent Demands to insurance companies, including GEICO.

(ii)    Defendant Erik T. Bendiks, M.D. ("Bendiks") is licensed to practice medicine in North Carolina. Bendiks owned, controlled, and was the member of Apex Spine, directed the performance of the Fraudulent Services at Apex Spine, and caused hundreds of fraudulent medical bills and reports to be submitted through Apex Spine in support of fraudulent Demands.

2

(iii)    Defendant Advanced Pain is a North Carolina medical professional corporation through which many of the Fraudulent Services purportedly were provided to Claimants, and was used as a vehicle to generate fraudulent bills and treatment reports so that they could be submitted as a part of and in support of fraudulent Demands to insurance companies, including GEICO.

(iv)    Defendant Sonia P. Pasi, M.D. ("Pasi") is licensed to practice medicine in North Carolina. Pasi owned and controlled Advanced Pain, directed the performance of the Fraudulent Services at Advanced Pain, and caused hundreds of fraudulent medical bills and reports to be submitted through Advanced Pain in support of fraudulent Demands.

6.      As set forth herein, the Defendants at all relevant times have known that:

(i)     the Defendants obtained their patient referrals through an unlawful referral and patient brokering scheme with the law firm that asserted the Demands on behalf of the Claimants;

(ii)    the Fraudulent Services were not provided in compliance with relevant laws and regulations governing healthcare practice in North Carolina;

(iii)   the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – unlawfully, and pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants and their associates, rather than to treat or otherwise benefit the Claimants who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services never were legitimately provided in the first instance; and

(v)     the Defendants' bills and reports for the Fraudulent Services misrepresented the Claimants' conditions, that the Fraudulent Services were lawfully provided, and the nature, extent, results, and medical necessity of the Fraudulent Services, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and thereby enrich the Defendants and their associates.

7.      The charts annexed hereto as Exhibits "1" and "2" set forth a large representative sample of the charges for the Fraudulent Services that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mails and the interstate wires in support of the fraudulent Demands.

3

8.     The Defendants' fraudulent and unlawful scheme began no later than 2020 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $2,800,000.00.

## THE PARTIES

### I.     Plaintiffs

9.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in North Carolina.

### II.     Defendants

10.     Defendant Apex Spine is a North Carolina medical professional limited liability company with its principal place of business in North Carolina. Apex Spine was organized in North Carolina on or about December 3, 2020, was owned and controlled by Bendiks, had Bendiks as its member, and was used by Bendiks as a vehicle to generate fraudulent bills and treatment reports for the Fraudulent Services, so that they could be submitted as a part of and in support of fraudulent Demands to insurance companies, including GEICO.

11.     Defendant Bendiks resides in and is a citizen of Georgia, and was licensed to practice medicine in North Carolina on or about November 30, 2020. Bendiks owned, controlled, and was the member of Apex Spine, purported to perform many of the Fraudulent Services at Apex Spine, and used Apex Spine as a vehicle to generate fraudulent bills and treatment reports for the Fraudulent Services, so that they could be submitted as a part of and in support of fraudulent Demands to insurance companies, including GEICO.

4

12.     Defendant Advanced Pain is a North Carolina medical professional corporation with its principal place of business in North Carolina. Advanced Pain was incorporated in North Carolina on or about August 29, 2007, was owned and controlled by Pasi, and was used by Pasi as a vehicle to generate fraudulent bills and treatment reports for the Fraudulent Services, so that they could be submitted as a part of and in support of fraudulent Demands to insurance companies, including GEICO.

13.     Defendant Pasi resides in and is a citizen of North Carolina, and was licensed to practice medicine in North Carolina on or about June 20, 2002. Pasi owned and controlled Advanced Pain, purported to perform many of the Fraudulent Services at Advanced Pain, and used Advanced Pain as a vehicle to generate fraudulent bills and treatment reports for the Fraudulent Services, so that they could be submitted as a part of and in support of fraudulent Demands to insurance companies, including GEICO.

## III.     Other Relevant Individual and Entity

14.     Although they are not named as defendants in this action, Hurt 999 Law Offices of Shane Smith, PC ("Shane Smith Law") and Ronald Shane Smith, Esq. ("Shane Smith") are relevant to understanding the Defendants' fraudulent and unlawful scheme and the claims that Plaintiffs assert in this case.

15.     Shane Smith Law is a Georgia legal professional corporation that is authorized to do business in North Carolina. Shane Smith Law was incorporated in Georgia on or about April 22, 2015, and at all relevant times was owned and controlled by Shane Smith and used as a vehicle by Shane Smith make unlawful patient referrals to the Defendants, and to submit fraudulent and inflated Demands to insurers in North Carolina, including GEICO.

5

16.     Shane Smith is an attorney who was licensed to practice law in North Carolina on March 12, 2021, and owns and controls Shane Smith Law.

17.     As set forth herein, Shane Smith and Shane Smith Law entered into an unlawful referral and patient brokering scheme with the Defendants, whereby Shane Smith and Shane Smith Law – who represented Claimants in connection with BI and UM claims – agreed to refer Claimants to the Defendants for medically unnecessary Fraudulent Services. In exchange for these medically unnecessary referrals from Shane Smith and Shane Smith Law, the Defendants agreed to perform the medically unnecessary Fraudulent Services, and to falsify and exaggerate the severity of the Claimants' injuries in their bills and treatment reports, in order to inflate Plaintiffs' payments on the Claimants' BI and UM Demands, and enrich themselves.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

19.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

20.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

21.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Western District of North Carolina is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

6

## ALLEGATIONS COMMON TO ALL CLAIMS

22.     GEICO underwrites automobile insurance in North Carolina.

**I.     Pertinent Law Governing Healthcare Practice and Automobile Insurance in North Carolina**

23.     Under the North Carolina Motor Vehicle Safety and Financial Responsibility Act (N.C. Gen. Stat. § 20-279.21), North Carolina drivers are required to carry a minimum of $30,000.00 per person or $60,000.00 per accident in bodily injury/uninsured motorist insurance coverage.

24.     Under North Carolina law, insurers such as GEICO may be subject to substantial liability if they fail to "deal fairly and in good faith" with insurance claimants.

25.     For example, N.C. Gen. Stat. § 58-63-15(11)(f) prohibits insurers from "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."

26.     N.C. Gen. Stat. § 58-63-15(11)(g) prohibits "[c]ompelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured."

27.     N.C. Gen. Stat. § 58-63-15(11)(h) prohibits "attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled."

28.     N.C. Gen. Stat. § 58-63-15(11)(n) prohibits "failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

29.     Any violation by an insurer under N.C. Gen. Stat. § 58 constitutes an unfair and deceptive trade practice under N.C. Gen. Stat. § 75-1.1.

30.     A violation of N.C. Gen. Stat. § 75-1.1 can subject an insurer to a penalty of treble damages and attorneys' fees in an action brought pursuant to an insurer's violation of the various requirements set forth in N.C. Gen. Stat. § 58-63-15(11).

31.     At the same time, North Carolina broadly proscribes insurance fraud. For example, among other things, N.C. Gen. Stat. § 58-2-161(b) specifies that:

> Any person who, with the intent to injure, defraud, or deceive an insurer or insurance claimant:
>
>> (1) Presents or causes to be presented a written or oral statement, including computer-generated documents as part of, in support of, or in opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains false or misleading information concerning any fact or matter material to the claim, or
>>
>> (2) Assists, abets, solicits, or conspires with another person to prepare or make any written or oral statement that is intended to be presented to an insurer or insurance claimant in connection with, in support of, or in opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains false or misleading information concerning a fact or matter material to the claim
>
> is guilty of a Class H felony.

32.     In keeping with North Carolina's broad proscription against insurance fraud, N.C. Gen. Stat. § 90-401 provides, in pertinent part, that:

> A healthcare provider shall not financially compensate in any manner a person, firm, or corporation for recommending or securing the healthcare provider's employment by a patient, or as a reward for having made a recommendation resulting in the healthcare provider's employment by a patient.

33.     Relatedly, N.C. Gen. Stat. § 90-401.1 provides that:

> It shall be unlawful for a healthcare provider or the provider's employee or agent to initiate direct personal contact or telephone contact with any injured, diseased, or infirmed person, or with any other person residing in the injured, diseased, or infirmed person's household, for a period of 90 days following the injury or the onset of the disease or infirmity, if the purpose of initiating the contact, in whole or in part, is to attempt to induce or persuade the injured, diseased, or infirmed person to become a patient of the healthcare provider. This section shall not be construed to prohibit a healthcare provider's use of posted letters,

8

brochures, or information packages to solicit injured, diseased, or infirmed persons, so long as such use does not entail direct personal contact with the person.

## II.    The Defendants' Fraudulent and Unlawful Scheme

34.    Beginning no later than 2020, and continuing through the present day, the Defendants masterminded and implemented a fraudulent and unlawful scheme with Shane Smith and Shane Smith Law, who represented Claimants in connection with BI and UM claims.

## A.    The Payment and Receipt of Unlawful Compensation Between and Among the Defendants, Shane Smith Law, and Shane Smith in Exchange for Patient Referrals

35.    Shane Smith and Shane Smith Law represented the Claimants identified in Exhibits "1" and "2" in connection with BI and UM claims and, if GEICO and other insurers paid inflated amounts on the claims, Shane Smith and Shane Smith Law themselves made more money.

36.    However, GEICO and other insurers would have no reason to make large payments in connection with the Claimants' BI and UM claims if – as actually was the case – the Claimants had not suffered any serious, long-term, debilitating injuries in their underlying automobile accidents.

37.    In fact, to the extent that the Claimants identified in Exhibits "1" and "2" suffered any injuries in their automobile accidents, their injuries very often were minor soft tissue injuries such as sprains and strains.

38.    Because minor soft tissue injuries such as sprains or strains almost always resolve after a short course of conservative treatment, or no treatment at all, Shane Smith Law and Shane Smith knew that their ability to legitimately obtain large payments from GEICO and other insurers on the Claimants' BI and UM claims would be limited, inasmuch as they would be unable to demonstrate that the Claimants suffered from any serious, long-term, debilitating injuries sufficient to warrant such large BI or UM payments.

9

39.     At the same time, the Defendants wanted to obtain patient referrals, and collect as much payment as they could for their Fraudulent Services, without regard for whether the Fraudulent Services were medically necessary or warranted.

40.     However, because there were numerous similar physicians and healthcare practices that operated in the same area as the Defendants, and that were better-established than the Defendants, the Defendants knew that their ability to legitimately obtain large payments for their Fraudulent Services would be limited.

41.     Accordingly, the Defendants, Shane Smith, and Shane Smith Law entered into secret and unlawful agreements, whereby Shane Smith and Shane Smith Law agreed to solicit and refer the Claimants identified in Exhibits "1" and "2" to the Defendants for medically unnecessary Fraudulent Services. In exchange for these medically unnecessary referrals from Shane Smith and Shane Smith Law, the Defendants agreed to perform the medically unnecessary Fraudulent Services, and to falsify and exaggerate the nature, extent, results, and medical necessity of the Fraudulent Services, as well as the severity of the Claimants' injuries, in order to inflate Plaintiffs' payments on the Claimants' BI and UM Demands, and thereby enrich the Defendants, Shane Smith, and Shane Smith Law.

42.     The Defendants were enriched by Plaintiffs' inflated payments on the Claimants' BI and UM claims, because Shane Smith and Shane Smith Law arranged for the Defendants to obtain liens on the claims, which were tied to the total amounts that the Defendants billed for their Fraudulent Services, and which entitled the Defendants to be paid for their Fraudulent Services out of the proceeds of the Claimants' BI and UM claims.

43.     In keeping with the fact that the Defendants, Shane Smith, and Shane Smith Law were engaged in an unlawful referral and patient brokering scheme, Shane Smith and Shane Smith

Law oftentimes directed the Claimants identified in Exhibits "1" and "2" to travel very long distances from their homes in order to receive the medically unnecessary Fraudulent Services from the Defendants, despite the fact that there were many other reputable healthcare services providers that were actually located much closer to the Claimants' homes.

44.    In further keeping with the fact that the Defendants, Shane Smith, and Shane Smith Law were engaged in an unlawful referral and patient brokering scheme which was designed to enrich Shane Smith, Shane Smith Law, and the Defendants rather than to benefit the Claimants who were subjected to the Fraudulent Services, many of the Claimants stated that it was their attorneys at Shane Smith Law who referred them and caused them to present to healthcare clinics such as Apex Ortho and/or Advanced Pain, despite the fact that Apex Ortho and/or Advanced Pain were inconveniently located many miles from the Claimants' homes.

45.    The Defendants' fraudulent bills and treatment reports were designed to and, in fact, did cause GEICO to pay the BI Claims and UM Claims at much higher amounts than otherwise would be warranted without the fraudulent bills and treatment reports from the Defendants, oftentimes for the entire policy limits. Absent the Defendants' fraudulent bills and reports, the Claimants' claims would include no medical treatment at all, or else basic chiropractic and/or physical therapy treatment for alleged soft tissue injuries with total medical expenses that would be significantly less than the applicable policy limits.

46.    The Defendants' bills and treatment reports for the Fraudulent Services, which falsely represented that the Claimants suffered serious injuries in their automobile accidents, requiring extensive and expensive treatment, were intended to, and did, cause the Claimants' claims – and Plaintiffs' payments on the claims – to be artificially and substantially inflated.

47.    This "pay–to–play" arrangement violated N.C. Gen. Stat. § 58-2-161(b), inasmuch

11

as the Defendants, together with Shane Smith and Shane Smith Law, routinely presented or caused to be presented bills and treatment reports for the Fraudulent Services, as well as Demands, which misrepresented the Claimants' conditions, as well as the nature, extent, medical necessity, and results of the Fraudulent Services, and whether they were lawfully provided in the first instance.

48. The Defendants' fraudulent scheme also violated N.C. Gen. Stat. § 90-401, because the Defendants' falsified bills and treatment reports constituted unlawful compensation to Shane Smith and Shane Smith Law for recommending or securing the Defendants' employment by the Claimants.

49. In addition, the Defendants' fraudulent scheme violated N.C. Gen. Stat. § 90-401.1, because – on behalf of Defendants – Shane Smith and Shane Smith Law often initiated direct personal or telephone contact with the Claimants within 90 days of their accidents, at least in part to induce or persuade the Claimants to seek medically unnecessary "treatment" from the Defendants.

50. For example:

(i) On April 16, 2018, a Claimant named CH was involved in an automobile accident. Thereafter, in December 2020, Shane Smith and Shane Smith Law caused CH to be referred to Apex Ortho and Bendiks pursuant to their unlawful patient referral scheme. In fact, CH stated that her attorneys at Shane Smith Law referred her to Dr. Bendiks – who "came to Charlotte to meet [CH] at Apex Ortho – to get a "second opinion" despite the fact that Apex Ortho was inconveniently located over 195 miles from CH's home. Thereafter, Apex Ortho and Bendiks purported to provide CH with expensive and medically unnecessary examinations, medications, x-rays, and pain management injections between December 2020 and May 2022, to create the illusion that CH suffered from severe, long-term, debilitating injuries which required extensive and expensive treatment. Apex Ortho and Bendiks generated false and fraudulent treatment reports for these services, which misrepresented the nature, extent, results, and medical necessity of the services, as well as the Claimant's condition. Then, as unlawful compensation for the patient referral, Apex Ortho and Bendiks provided these false and fraudulent treatment reports, and the related inflated billing, to Shane Smith Law and Shane Smith with the knowledge that they would be submitted to GEICO to create a false basis for the Claimant's inflated BI/UM claim.

12

(ii)     On November 10, 2020, a Claimant named SC was involved in an automobile accident. Thereafter, in November 2020, Shane Smith and Shane Smith Law caused SC to be referred to Advanced Pain and Pasi pursuant to their unlawful patient referral scheme. In fact, SC stated that her attorneys at Shane Smith Law referred her to Advanced Pain to receive additional treatment, after having already previous referred her to a chiropractic provider where she received chiropractic treatment, this was despite the fact that Advanced Pain was inconveniently located over 25 miles from SC's home. Thereafter, Advanced Pain and Pasi purported to provide SC with expensive and medically unnecessary examinations, EDX tests, and pain management injections between November 2020 and June 2021, to create the illusion that SC suffered from severe, long-term, debilitating injuries which required extensive and expensive treatment. Advanced Pain and Pasi generated false and fraudulent treatment reports for these services, which misrepresented the nature, extent, results, and medical necessity of the services, as well as the Claimant's condition. Then, as unlawful compensation for the patient referral, Advanced Pain and Pasi provided these false and fraudulent treatment reports, and the related inflated billing, to Shane Smith Law and Shane Smith with the knowledge that they would be submitted to GEICO to create a false basis for the Claimant's inflated BI/UM claim.

(iii)    On June 14, 2021, a Claimant named EC was involved in an automobile accident. Thereafter, in August 2021, Shane Smith and Shane Smith Law caused EC to be referred to Advanced Pain and Pasi pursuant to their unlawful patient referral scheme. In fact, EC stated that her attorneys at Shane Smith Law referred her to Advanced Pain to receive additional treatment, after having already previous referred her to a chiropractic provider where she received chiropractic treatment, despite the fact that Advanced Pain was inconveniently located over 125 miles from EC's home. Thereafter, Advanced Pain and Pasi purported to provide EC with expensive and medically unnecessary examinations, acupuncture treatments, EDX tests, and pain management injections between August 2021 and January 2022, to create the illusion that EC suffered from severe, long-term, debilitating injuries which required extensive and expensive treatment. Advanced Pain and Pasi generated false and fraudulent treatment reports for these services, which misrepresented the nature, extent, results, and medical necessity of the services, as well as the Claimant's condition. Then, as unlawful compensation for the patient referral, Advanced Pain and Pasi provided these false and fraudulent treatment reports, and the related inflated billing, to Shane Smith Law and Shane Smith with the knowledge that they would be submitted to GEICO to create a false basis for the Claimant's inflated BI/UM claim.

(iv)     On June 21, 2021, a Claimant named DM was involved in an automobile accident. Thereafter, in November 2021, Shane Smith and Shane Smith Law caused DM to be referred to Apex Ortho and Bendiks pursuant to their unlawful patient referral scheme. In fact, DM stated that her attorneys at Shane Smith Law referred her to Apex Ortho to receive additional treatment, after having already previous referred

13

her to a chiropractic provider where she received chiropractic treatment, despite the fact that Apex Ortho was inconveniently located over 130 miles from DM's home. Thereafter, Apex Ortho and Bendiks purported to provide DM with expensive and medically unnecessary examinations, medications, x-rays, and pain management injections between November 2021 and April 2022, to create the illusion that DM suffered from severe, long-term, debilitating injuries which required extensive and expensive treatment. Apex Ortho and Bendiks generated false and fraudulent treatment reports for these services, which misrepresented the nature, extent, results, and medical necessity of the services, as well as the Claimant's condition. Then, as unlawful compensation for the patient referral, Apex Ortho and Bendiks provided these false and fraudulent treatment reports, and the related inflated billing, to Shane Smith Law and Shane Smith with the knowledge that they would be submitted to GEICO to create a false basis for the Claimant's inflated BI/UM claim.

(v)     On July 20, 2021, a Claimant named IM was involved in an automobile accident. Thereafter, in August 2021, Shane Smith and Shane Smith Law caused IM to be referred to Apex Ortho and Bendiks pursuant to their unlawful patient referral scheme. In fact, IM stated that her attorneys at Shane Smith Law referred her to Apex Ortho to receive additional treatment, after having already referred her to a chiropractic provider where she received chiropractic treatment, despite the fact that Apex Ortho was inconveniently located over 50 miles from IM's home. Thereafter, Apex Ortho and Bendiks purported to provide IM with expensive and medically unnecessary examinations, medications, and x-rays between August 2021 and November 2021 to create the illusion that IM suffered from severe, long-term, debilitating injuries which required extensive and expensive treatment. Apex Ortho and Bendiks generated false and fraudulent treatment reports for these services, which misrepresented the nature, extent, results, and medical necessity of the services, as well as the Claimant's condition. Then, as unlawful compensation for the patient referral, Apex Ortho and Bendiks provided these false and fraudulent treatment reports, and the related inflated billing, to Shane Smith Law and Shane Smith with the knowledge that they would be submitted to GEICO to create a false basis for the Claimant's inflated BI/UM claim.

51.     These are only representative examples. In the claims identified in Exhibits "1" – "2", Shane Smith Law and Shane Smith routinely caused Claimants to be referred to Apex Spine, Bendiks, Advanced Pain, and Pasi in exchange for unlawful compensation from the Defendants.

**B.     The Defendants' Fraudulent Charges for Initial Examinations**

52.     Upon receiving a referral pursuant to the unlawful compensation that the Defendants paid to Shane Smith Law and Shane Smith in the form of the false and fraudulent

treatment reports and bills which exaggerated the extent and severity of the Claimants' injuries, the Defendants purported to provide virtually every Claimant identified in Exhibits "1" – "2" with an initial examination.

53. In the examinations identified in Exhibit "1", Bendiks – or some other healthcare provider acting on his behalf and at his direction – purported to perform the majority of the putative initial examinations on behalf of Apex Ortho, and then caused bills for the examinations to be submitted to GEICO under current procedural terminology ("CPT") codes 99203 or 99204, typically resulting in a charge of $630.00 to $735.00 for each purported initial examination.

54. As set forth in Exhibit "2", Pasi purported to perform the majority of the putative initial examinations on behalf of Advanced Pain, and then caused bills for the examinations to be submitted to GEICO under CPT code 99245, typically resulting in a charge of $699.00 for each purported initial examination.

55. In this context, CPT codes – or billing codes – are promulgated by the American Medical Association (the "AMA"), and the standard codes used to bill for healthcare services in the United States. Generally, each individual CPT code identifies a particular healthcare service that was provided to a patient.

56. When a healthcare provider submits a claim for payment using a CPT code, it represents – among other things – that: (i) the service described by the specific CPT code was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code was reasonable and medically necessary; and (iii) the service and the attendant fee are not excessive.

57. In the claims for initial examinations identified in Exhibits "1" – "2", the Defendants' bills for their purported initial examinations – and the accompanying reports of the

15

examinations – were fraudulent in that they misrepresented the extent, nature, results, and medical necessity of the examinations, as well as the Claimants' conditions, and that the underlying examinations were lawfully provided and entitled to reimbursement.

1.     **Misrepresentations Regarding the Severity of the Claimants' Presenting Problems**

58.     Pursuant to the American Medical Association's CPT Assistant, which governs the use of CPT codes, the use of CPT code 99203 to bill for an initial patient examination represented that the patient presented with problems of moderate severity.

59.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

60.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

61.     Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically

are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

62.     Additionally, pursuant to CPT Assistant, the use of CPT code 99204 to bill for an initial patient examination represented that the patient presented with problems of moderate to high severity.

63.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

64.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

65.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient

examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

66.    Similarly, pursuant to the CPT Assistant, the use of CPT code 99245 to bill for an initial patient examination typically represented that the patient presented with problems of moderate to high severity.

67.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99245 to bill for an initial patient examination. Specifically:

(i)    Examination in the emergency, room for a 25-year-old male with severe, acute, closed head injury (Neurosurgery)

(ii)   Office examination for a 23-year-old female with Stage II A Hodgkin's disease with positive supraclavicular and mediastinal nodes. (Radiation Oncology)

68.    Thus, as with CPT code 99204, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99245 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

69.    By contrast, to the extent that the Claimants identified in Exhibits "1" - "2" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems very often were low or minimal severity soft tissue injuries such as sprains and strains.

70.    For instance, and in keeping with the fact that the Claimants identified in Exhibits "1" - "2" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low or minimal severity, in many of the claims identified in Exhibits "1" - "2" the Claimants did not seek treatment at any hospital as the result of their accidents.

71.    To the limited extent that the Claimants did report to a hospital after their accidents,

they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

72. Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Claimants' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

73. Even so, in the initial examinations identified in Exhibits "1" - "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely billed for their putative initial examinations using CPT codes 99203, 99204, and/or 99245, and thereby falsely represented that the Claimants presented with problems of moderate or moderate to high severity.

74. For example:

(i)     On October 9, 2020, a Claimant named DW was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DW's vehicle was drivable following the accident. In keeping with the fact that DW was not seriously injured in the accident, DW did not visit any hospital emergency room following the accident. To the extent that DW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of DW on March 30, 2021 Apex Spine and Bendiks caused a bill for the initial examination to be submitted to GEICO using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On January 27, 2021, a Claimant named LT was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LT's vehicle was drivable following the accident. In keeping with the fact that LT was not seriously injured in the accident, LT did not visit any hospital emergency room following the accident. To the extent that LT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of LT on March 3, 2021, Advanced Pain and Pasi caused a bill for the initial examination to be submitted to GEICO using CPT code 99245, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iii)     On February 20, 2021, a Claimant named DC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain. In keeping with the fact that DC was not seriously injured in the accident, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of DC on March 16 2021, Advanced Pain and Pasi caused a bill for the initial examination to be submitted to GEICO using CPT code 99245, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)     On June 9, 2021, a Claimant named KB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KB's vehicle was drivable following the accident. The police report further indicated that KB was not injured and did not complain of any pain. In keeping with the fact that KB was not seriously injured in the accident, KB did not visit any hospital emergency room following the accident. However, KB did self-present four days later to Chatham Hospital where she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that KB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of KB on July 12, 2021, Advanced Pain and Pasi caused a bill for the initial examination to be submitted to GEICO using CPT code 99245, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)     On July 9, 2021, a Claimant named CM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. In keeping with the fact that CM was not seriously injured in the accident, when CM presented later that same day to Wayne Memorial Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that CM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of CM on August 3, 2021, Advanced Pain and Pasi caused a bill for the initial examination to be submitted to GEICO using CPT code 99245, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)     On July 11, 2021, a Claimant named DM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable

following the accident. The police report further indicated that DM was not injured and did not complain of any pain. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of DM on August 23, 2021, Advanced Pain and Pasi caused a bill for the initial examination to be submitted to GEICO using CPT code 99245, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vii)    On December 6, 2021, a Claimant named MW was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MW's vehicle was drivable following the accident. In keeping with the fact that MW was not seriously injured in the accident, MW did not visit any hospital emergency room following the accident. To the extent that MW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of MW on January 13, 2022, Apex Spine and Bendiks caused a bill for the initial examination to be submitted to GEICO using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii)    On February 19, 2022, a Claimant named EO was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EO's vehicle was drivable following the accident. The police report further indicated that EO was not injured and did not complain of any pain. In keeping with the fact that EO was not seriously injured in the accident, EO did not visit any hospital emergency room following the accident. To the extent that EO experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of EO on March 15, 2022, Apex Spine and Bendiks caused a bill for the initial examination to be submitted to GEICO using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)    On August 25, 2022, a Claimant named CB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CB's vehicle was drivable following the accident. In keeping with the fact that CB was not seriously injured in the accident, CB did not visit any hospital emergency room following the accident. To the extent that CB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of CB on September 7, 2022, Apex Spine and Bendiks caused a bill for the initial examination to be

submitted to GEICO using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x) On December 3, 2022, a Claimant named TC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TC's vehicle was drivable following the accident. In keeping with the fact that TC was not seriously injured in the accident, TC did not visit any hospital emergency room following the accident. To the extent that TC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, following a purported initial examination of TC on December 14, 2022, Apex Spine and Bendiks caused a bill for the initial examination to be submitted to GEICO using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

75.    These are only representative examples. In the initial examinations identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the Claimants presented with problems of moderate or moderate to high severity, when in fact the Claimants' problems were limited to low or minimal-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

76.    In the initial examinations identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the Claimants presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99203, 99204, or 99245, because examinations billable under CPT codes 99203, 99204, or 99245 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

77.    In the initial examinations identified in Exhibits "1" – "2" Apex Spine, Bendiks, Advanced Pain, and Pasi also routinely falsely represented that the Claimants presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Claimants, so that

the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

2.   **Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations**

78.   Pursuant to the CPT Assistant, the use of CPT codes 99203, 99204, or 99245 to bill for an initial examination represented that the physician or other healthcare provider who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family when the examination was billed under CPT Code 99203, at least 45 minutes of face-to-face time with the patient or the patient's family when billed under CPT Code 99204, and at least 55 minutes of face-to-face time with the patient or the patient's family when billed under CPT Code 99245.

79.   As set forth in Exhibit "1", Apex Spine and Bendiks billed the majority of their initial examinations under CPT codes 99203 or 99204, and thereby represented that the physician or other healthcare practitioner who purported to perform the initial examinations (typically Bendiks) spent at least 30 or 45 minutes of face-to-face time with the Claimants or the Claimants' families during the supposed examinations.

80.   Similarly, as set forth in Exhibit "2", Advanced Spine and Pasi billed the majority of their initial examinations under CPT code 99245, and thereby represented that the physician or other healthcare practitioner who purported to perform the initial examinations (namely Pasi) spent at least 55 minutes of face-to-face time with the Claimants or the Claimants' families during the putative examinations.

81.     In fact, in the initial examinations identified in Exhibits "1" – "2", neither Bendiks, Pasi, nor any other healthcare provider associated with Apex Spine or Advanced Pain hardly ever legitimately spent 30 minutes of face-to-face time with the Claimants or their families when conducting the examinations, much less 45 or 55 minutes.

82.     Rather, in the initial examinations identified in Exhibits "1" – "2", the initial examinations did not entail more than 15 minutes of face-to-face time between the examining healthcare practitioner and the Claimants or their families, to the extent that the examinations actually were performed in the first instance.

83.     For instance, and in keeping with the fact that the initial examinations allegedly provided by the Defendants did not entail more than 15 minutes of face-to-face time with the patients or their families, the Defendants used template forms in purporting to conduct the initial examinations.

84.     The template forms that the Defendants used to document the putative examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

85.     All that was required to complete the template forms was a brief patient interview and a brief physical examination of the Claimants, consisting of a check of some of the Claimants' vital signs, basic range of motion and muscle strength testing, and other limited examinations of the Claimants' musculoskeletal systems.

86.     These interviews and examinations did not require any physician or healthcare provider associated with Apex Spine or Advanced Pain to spend more than 15 minutes of face-to-face time with the Claimants during the putative initial examinations.

87. In the initial examinations identified in Exhibits "1" Apex Spine and Bendiks falsely represented that the examinations billed under CPT Codes 99203 and 99204 involved at least 30 to 45 minutes of face-to-face time with the Claimants or their families in order to create a false basis for their charges under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that require less time to perform.

88. Similarly, in the initial examinations identified in Exhibit "2", Advanced Pain and Pasi falsely represented that the examinations billed under CPT Code 99245 involved at least 55 minutes of face-to-face time with the Claimants or their families in order to create a false basis for their charges under CPT code 99245, because examinations billable under CPT code 99245 are reimbursable at a higher rate than examinations that require less time to perform.

89. The Defendants falsified the nature and extent of their initial examinations in this manner so that the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, maximize the amount of fraudulent billing they could submit to GEICO, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

**3.    Misrepresentations Regarding "Detailed" or "Comprehensive" Physical Examinations**

90. Moreover, in the claims identified in Exhibit "1" for initial examinations under CPT code 99203, Apex Spine and Bendiks routinely falsely represented the nature and extent of the underlying physical examinations.

91.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represented that the physician or other healthcare practitioner who performed the examination conducted a "detailed" physical examination.

92.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the physician or other healthcare practitioner performing the examination conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

93.    To the extent that the Claimants identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were generally limited to minor musculoskeletal complaints, such as sprains and strains.

94.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other healthcare practitioner has not conducted an extended examination of a patient's musculoskeletal organ system unless the practitioner has documented findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)  examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)    brief assessment of mental status;

(vi)   examination of gait and station;

(vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and

neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)   examination of sensation.

95.   Similarly, pursuant to the CPT Assistant, the use of CPT codes 99204 or 99245 to bill for a patient examination represented that the physician or other healthcare practitioner who performed the examination conducted a "comprehensive" physical examination.

96.   A physical examination does not qualify as "comprehensive" unless the examining physician or other healthcare practitioner either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

97.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician or other healthcare practitioner has not conducted a general examination of multiple patient organ systems unless the physician or practitioner has documented findings with respect to at least eight organ systems.

98.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician or practitioner has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or practitioner has documented findings with respect to:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)     inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)     coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

99.     In the claims for initial examinations identified in Exhibit "1", when Apex Spine and Bendiks billed for the initial examinations under CPT code 99203, they falsely represented that Bendiks, or some other healthcare practitioner associated with Apex Spine, performed "detailed" physical examinations on the Claimants they purported to treat during the initial examinations.

100.     In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", neither Bendiks, nor any other healthcare practitioner associated with Apex Spine, conducted extended examinations of the Claimants' musculoskeletal systems, or any of the Claimants' other systems.

101.     For instance, neither Bendiks, nor any other healthcare practitioner associated with Apex Spine, conducted extended examinations of the Claimants' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination; and/or

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or examination of sensation.

102.    Similarly, in the claims for initial examinations identified in Exhibits "1" – "2", when the Defendants billed for the initial examinations under CPT codes 99204 and 99245, they falsely represented that Bendiks, Pasi, or some other healthcare practitioner associated with Apex Spine or Advanced Pain performed "comprehensive" physical examinations on the Claimants they purported to treat during the initial examinations.

103.    In fact, with respect to the claims for initial examinations under CPT codes 99204 and 99245 that are identified in Exhibits "1" – "2", neither Bendiks, Pasi, nor any other healthcare practitioner associated with Apex Spine or Advanced Pain actually conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

104.    For instance, in the claims under CPT codes 99204 and 99245 identified in Exhibits "1" – "2", neither Bendiks, Pasi, nor any other healthcare practitioner associated with Apex Spine

or Advanced Pain conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

105.    Furthermore, although Bendiks, Pasi, or some other healthcare practitioner acting on their behalf, typically purported to provide an examination of the Claimants' musculoskeletal systems in many of the claims for initial examinations identified in Exhibits "1" – "2", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

106.    For example:

(i)     On January 12, 2021, Apex Spine and Bendiks caused a bill to be submitted to GEICO under CPT code 99204 for an initial examination of a Claimant named DD, and thereby represented that they had provided a "comprehensive" physical examination to DD. However, neither Bendiks nor any other healthcare practitioner

associated with Apex Spine documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(ii)      On April 26, 2021, Advanced Pain and Pasi caused a bill to be submitted to GEICO under CPT code 99245 for an initial examination of a Claimant named KK, and thereby represented that they had provided a "comprehensive" physical examination to KK. However, neither Pasi nor any other healthcare practitioner associated with Advanced Pain documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(iii)     On April 28, 2021, Advanced Pain and Pasi caused a bill to be submitted to GEICO under CPT code 99245 for an initial examination of a Claimant named DZ, and thereby represented that they had provided a "comprehensive" physical examination to RS. However, neither Pasi nor any other healthcare practitioner associated with Advanced Pain documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(iv)     On August 31, 2021, Advanced Pain and Pasi caused a bill to be submitted to GEICO under CPT code 99245 for an initial examination of a Claimant named DN, and thereby represented that they had provided a "comprehensive" physical examination to DN. However, neither Pasi nor any other healthcare practitioner associated with Advanced Pain documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(v)      On November 4, 2021, Advanced Pain and Pasi caused a bill to be submitted to GEICO under CPT code 99245 for an initial examination of a Claimant named PH, and thereby represented that they had provided a "comprehensive" physical examination to PH. However, neither Pasi nor any other healthcare practitioner associated with Advanced Pain documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(vi)     On December 21, 2021, Advanced Pain and Pasi caused a bill to be submitted to GEICO under CPT code 99245 for an initial examination of a Claimant named RS, and thereby represented that they had provided a "comprehensive" physical examination to RS. However, neither Pasi nor any other healthcare practitioner associated with Advanced Pain documented findings with respect to at least eight

31

of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(vii) On or about March 11, 2022, Apex Spine and Bendiks caused a bill to be submitted to GEICO under CPT code 99203 for an initial examination of a Claimant named KR, and thereby represented that they had provided a "detailed" physical examination to KR. However, neither Bendiks, nor any other healthcare practitioner associated with Apex Spine documented an extended examination of KR's musculoskeletal system, despite the fact that – to the extent KR had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii) On July 25, 2022, Apex Spine and Bendiks caused a bill to be submitted to GEICO under CPT code 99204 for an initial examination of a Claimant named AH, and thereby represented that they had provided a "comprehensive" physical examination to AH. However, neither Bendiks nor any other healthcare practitioner associated with Apex Spine documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(ix) On August 19, 2022, Apex Spine and Bendiks caused a bill to be submitted to GEICO under CPT code 99204 for an initial examination of a Claimant named PS, and thereby represented that they had provided a "comprehensive" physical examination to PS. However, neither Bendiks nor any other healthcare practitioner associated with Apex Spine documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

(x) On October 19, 2022, Apex Spine and Bendiks caused a bill to be submitted to GEICO under CPT code 99204 for an initial examination of a Claimant named BB, and thereby represented that they had provided a "comprehensive" physical examination to BB. However, neither Bendiks nor any other healthcare practitioner associated with Apex Spine documented findings with respect to at least eight of the Claimant's organ systems, nor did they document a "complete" examination of the Claimant's musculoskeletal systems or any of the Claimant's other organ systems.

107. These are only representative examples. In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Apex Spine and Bendiks routinely falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided

detailed physical examinations because the examining physicians or other healthcare practitioners had not documented an extended examination of the Claimants' affected body areas and other symptomatic or related organ systems.

108.     Similarly, in the claims for initial examinations under CPT codes 99204 and 99245 that are identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations because the examining physicians or other healthcare practitioners had not documented: (i) a general examination of multiple patient organ systems; or (ii) a complete examination of a single patient organ system.

109.     In the claims for initial examinations under CPT code 99203, 99204, or 99245 that are identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Claimants in order to create a false basis for their charges for the examinations under CPT codes 99203, 99204, and/or 99245, because examinations billable under CPT codes 99203, 99204, and 99245 are reimbursable at higher rates than examinations that do not require the examining physician or other healthcare practitioner to provide "detailed" or "comprehensive" physical examinations.

110.     The Defendants falsified the nature and extent of their initial examinations in this manner so that the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, maximize the amount of fraudulent billing they could submit to GEICO, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

**4.    Misrepresentations Regarding the Extent of Medical Decision-Making**

111.    Moreover, pursuant to the CPT Assistant, the use of CPT code 99245 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "high complexity" medical decision-making.

112.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in legitimate, "moderate complexity" medical decision-making.

113.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for a patient examination represents that the physician or other healthcare practitioner who performed the examination engaged in legitimate, "low complexity" medical decision-making.

114.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

115.    As set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate moderate or high complexity medical decision-making, and therefore support the use of CPT codes 99204 or 99245 to bill for an initial examination, typically are problems that pose a serious threat to the patient's health, or even the patient's life.

116.    What is more, as set forth above, pursuant to the CPT Assistant, the presenting problems that could require legitimate low complexity medical decision-making, and therefore support the use of CPT code 99203 to bill for an initial examination, typically are either chronic

and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

117. By contrast, to the extent that the Claimants in the claims identified in Exhibits "1" – "2" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems generally were minor soft tissue injuries such as sprains and strains.

118. The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate, low, moderate, or high complexity medical decision-making.

119. First, in the initial examinations identified in Exhibits "1" – "2", the initial examinations generally did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

120. In fact, when the Claimants in the claims identified in Exhibits "1" – "2" presented to Apex Spine and Advanced Pain for "treatment", the Defendants generally did not review any significant amount of the Claimants' preexisting medical records except, occasionally, basic radiology or electrodiagnostic testing reports.

121. Furthermore, prior to the initial examinations, the Defendants generally did not request any medical records from any other providers, except, occasionally, basic radiology or electrodiagnostic testing reports.

122. Second, in the initial examinations identified in Exhibits "1" – "2", there was no risk of significant complications or morbidity – much less mortality – from the Claimants' relatively minor soft tissue injury complaints, to the extent that they actually had any complaints arising from automobile accidents at the time of the examinations.

123. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Apex Spine, Bendiks,

Advanced Pain, and Pasi, to the extent that they provided any such diagnostic procedures or treatment options in the first instance.

124.    In almost every instance, any "treatments" that Apex Spine, Bendiks, Advanced Pain, and Pasi actually provided were limited to the Fraudulent Services, none of which was health or life threatening if properly performed.

125.    Third, in the initial examinations identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi did not consider any significant number of diagnoses or treatment options for the Claimants during the initial examinations.

126.    Specifically, in the claims identified in Exhibits "1" – "2", during the initial examinations the Claimants typically did not present with any significant continuing medical problems that legitimately could be traced to an underlying automobile accident.

127.    Even so, Apex Spine, Bendiks, Advanced Pain, and Pasi prepared initial examination reports in which they provided a false series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Claimant.

128.    Then, based upon these false "diagnoses", Apex Spine, Bendiks, Advanced Pain, and Pasi directed Claimants to receive additional, medically unwarranted Fraudulent Services, regardless of their individual circumstances or presentation.

129.    For example:

(i)    On June 15, 2020, a Claimant named BF was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BF's vehicle was drivable following the accident. In keeping with the fact that BF was not seriously injured in the accident, BF did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On April 21, 2021, Bendiks, or some other healthcare practitioner acting on his behalf and at his direction, purported to conduct an initial examination of BF. Bendiks did not retrieve, review, or analyze any significant amount of medical

records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Bendiks did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bendiks provided BF with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BF's presenting problems, nor the treatment plan provided to BF by Apex Spine and Bendiks, presented any risk of significant complications, morbidity, or mortality. To the contrary, BF did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Apex Spine and Bendiks consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to BF. Even so, Apex Spine and Bendiks caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99204, and thereby falsely represented that Bendiks engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On October 9, 2020, a Claimant named DW was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DW's vehicle was drivable following the accident. In keeping with the fact that DW was not seriously injured in the accident, DW did not visit any hospital emergency room following the accident. To the extent that DW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On March 30, 2021, Bendiks, or some other healthcare practitioner acting on his behalf and at his direction, purported to conduct an initial examination of DW. Bendiks did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Bendiks did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bendiks provided DW with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that he – or some other healthcare practitioner acting on Bendiks's behalf – provided to virtually every other Insured. Furthermore, neither DW's presenting problems, nor the treatment plan provided to DW by Apex Spine and Bendiks, presented any risk of significant complications, morbidity, or mortality. To the contrary, DW did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Apex Spine and Bendiks consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to DW. Even so, Apex Spine and Bendiks caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99204, and thereby falsely represented that Bendiks engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)     On January 27, 2021, a Claimant named LT was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that LT's vehicle was drivable following the accident. In keeping with the fact that LT was not seriously injured in the accident, LT did not visit any hospital emergency room following the accident. To the extent that LT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On March 3, 2021, Pasi, or some other healthcare practitioner acting on her behalf and at her direction, purported to conduct an initial examination of LT. Pasi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Pasi did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pasi provided LT with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither LT's presenting problems, nor the treatment plan provided to LT by Advanced Pain and Pasi, presented any risk of significant complications, morbidity, or mortality. To the contrary, LT did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Advanced Pain and Pasi consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to LT. Even so, Advanced Pain and Pasi caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99245, and thereby falsely represented that Pasi engaged in some legitimate, high complexity medical decision-making during the purported examination.

(iv)     On February 20, 2021, a Claimant named DC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain. In keeping with the fact that DC was not seriously injured in the accident, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On March 16, 2021, Pasi, or some other healthcare practitioner acting on her behalf and at her direction, purported to conduct an initial examination of DC. Pasi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Pasi did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pasi provided DC with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither DC's presenting problems, nor the treatment plan provided to DC by Advanced Pain and Pasi, presented any risk of significant complications, morbidity, or mortality. To the contrary, DC did not need

any extensive treatment at all as a result of the accident, and the treatment plan provided by Advanced Pain and Pasi consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to DC. Even so, Advanced Pain and Pasi caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99245, and thereby falsely represented that Pasi engaged in some legitimate, high complexity medical decision-making during the purported examination.

(v)    On April 27, 2021, a Claimant named CG was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CG's vehicle was drivable following the accident. In keeping with the fact that CG was not seriously injured in the accident, when CG presented later that same day to Wake Forest Baptist Health Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that CG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On May 12, 2021, Bendiks, or some other healthcare practitioner acting on his behalf and at his direction, purported to conduct an initial examination of CG. Bendiks did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Bendiks did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bendiks provided CG with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that he – or some other healthcare practitioner acting on Bendiks's behalf – provided to virtually every other Insured. Furthermore, neither CG's presenting problems, nor the treatment plan provided to CG by Apex Spine and Bendiks, presented any risk of significant complications, morbidity, or mortality. To the contrary, CG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Apex Spine and Bendiks consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to CG. Even so, Apex Spine and Bendiks caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99204, and thereby falsely represented that Bendiks engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)    On June 9, 2021, a Claimant named KB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KB's vehicle was drivable following the accident. The police report further indicated that KB was not injured and did not complain of any pain. In keeping with the fact that KB was not seriously injured in the accident, KB did not visit any hospital emergency room following the accident. However, KB did self-present four days later to Chatham Hospital where she was briefly observed on an outpatient basis and released shortly

thereafter with no serious injury diagnosis. To the extent that KB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On July 12, 2021, Pasi, or some other healthcare practitioner acting on her behalf and at her direction, purported to conduct an initial examination of KB. Pasi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Pasi did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pasi provided KB with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither KB's presenting problems, nor the treatment plan provided to KB by Advanced Pain and Pasi, presented any risk of significant complications, morbidity, or mortality. To the contrary, KB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Advanced Pain and Pasi consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to KB. Even so, Advanced Pain and Pasi caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99245, and thereby falsely represented that Pasi engaged in some legitimate, high complexity medical decision-making during the purported examination.

(vii)    On July 9, 2021, a Claimant named CM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. In keeping with the fact that CM was not seriously injured in the accident, when CM presented later that same day to Wayne Memorial Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that CM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On August 3, 2021, Pasi, or some other healthcare practitioner acting on her behalf and at her direction, purported to conduct an initial examination of CM. Pasi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Pasi did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pasi provided CM with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither CM's presenting problems, nor the treatment plan provided to CM by Advanced Pain and Pasi, presented any risk of significant complications, morbidity, or mortality. To the contrary, CM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Advanced Pain and Pasi consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to CM. Even so, Advanced Pain and Pasi caused a bill to be

40

submitted to GEICO with a charge for the initial examination using CPT code 99245, and thereby falsely represented that Pasi engaged in some legitimate, high complexity medical decision-making during the purported examination.

(viii) On September 13, 2021, a Claimant named KM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KM's vehicle was drivable following the accident. The police report indicated that KM was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that KM was not seriously injured in the accident, KM did not present to any hospital emergency room immediately following the accident. To the extent that KM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On October 11, 2021, Bendiks, or some other healthcare practitioner acting on his behalf and at his direction, purported to conduct an initial examination of KM. Bendiks did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Bendiks did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bendiks provided KM with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that he – or some other healthcare practitioner acting on Bendiks's behalf – provided to virtually every other Insured. Furthermore, neither KM's presenting problems, nor the treatment plan provided to KM by Apex Spine and Bendiks, presented any risk of significant complications, morbidity, or mortality. To the contrary, KM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Apex Spine and Bendiks consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to KM. Even so, Apex Spine and Bendiks caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99204, and thereby falsely represented that Bendiks engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix) On June 1, 2022, a Claimant named TE was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TE's vehicle was drivable following the accident. In keeping with the fact that TE was not seriously injured in the accident, when TE self-presented two days later to Duke Health Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that TE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On December 8, 2021, Pasi, or some other healthcare practitioner acting on her behalf and at her direction, purported to conduct an initial examination of TE. Pasi did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Pasi did not

consider any significant number of diagnoses or management options in connection with the examination. Instead, Pasi provided TE with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither TE's presenting problems, nor the treatment plan provided to TE by Advanced Pain and Pasi, presented any risk of significant complications, morbidity, or mortality. To the contrary, TE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Advanced Pain and Pasi consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to TE. Even so, Advanced Pain and Pasi caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99245, and thereby falsely represented that Pasi engaged in some legitimate, high complexity medical decision-making during the purported examination.

(x)     On July 21, 2022, a Claimant named GC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GC's vehicle was drivable following the accident. The police report indicated that GC was not injured and did not complain of any pain at the scene of the accident. Nonetheless, GC self-presented later that same day to Pitt County Memorial Hospital where he was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. On September 20, 2022, Bendiks, or some other healthcare practitioner acting on his behalf and at his direction, purported to conduct an initial examination of GC. Bendiks did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination – beyond basic radiology testing reports. Moreover, Bendiks did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Bendiks provided GC with substantially the same, false list of objectively unverifiable soft tissue injury "diagnoses" that he – or some other healthcare practitioner acting on Bendiks's behalf – provided to virtually every other Insured. Furthermore, neither KM's presenting problems, nor the treatment plan provided to KM by Apex Spine and Bendiks, presented any risk of significant complications, morbidity, or mortality. To the contrary, GC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Apex Spine and Bendiks consisted of medically unnecessary interventional pain management services such as pain management injections, which if properly performed did not pose any significant risk to GC. Even so, Apex Spine and Bendiks caused a bill to be submitted to GEICO with a charge for the initial examination using CPT code 99204, and thereby falsely represented that Bendiks engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

130.    These are only representative examples. In the claims for initial examinations

identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the putative examinations involved medical decision making of low, moderate, or high complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99203, 99204, and 99245, because examinations billable under CPT codes 99203, 99204, and 99245 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

131.    In the initial examinations identified in Exhibits "1" – "2" Apex Spine, Bendiks, Advanced Pain, and Pasi also routinely falsely represented that the putative examinations involved medical decision making of low, moderate, or high complexity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Claimants, so that the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

**C.    The Fraudulent Charges for Urine Drug Screens by Pasi and Advanced Pain**

50.    In the claims identified in Exhibit "2", at the conclusion of their putative initial examinations, Pasi and Advanced Pain routinely purported to provide the Claimants with purported urine drug screens.

51.    Pasi and Advanced Pain then billed the urine drug screens to GEICO under CPT codes 81003 and 80307, typically resulting in a total charge of more than $400.00 for each purported drug screen.

52.    Like the charges for the other Fraudulent Services, Pasi and Advanced Pain's charges for the urine drug screens were fraudulent in that they were medically unnecessary and

43

were performed – to the extent that they were performed at all – pursuant to the Defendants' predetermined protocol, not to treat or otherwise benefit the Claimants.

53.    In a legitimate clinical setting, absent some indication that a patient is abusing drugs, or a legitimate question regarding the medications that a patient is taking, there generally will be no medical need to routinely administer drug screening during patient examinations.

54.    In almost all of the claims identified in Exhibit "2", there was no indication that the Claimants were abusing drugs, and there generally was no legitimate question regarding the medications that the Claimants were taking.

55.    Even so, in the claims identified in Exhibit "2", Pasi and Advanced Pain routinely performed medically unnecessary drug screens on the Claimants, and then falsely represented that the drug screens were medically warranted.

56.    Further, pursuant to the CPT Assistant, CPT code 80307 should be used to bill for drug screening only where that testing involves "instrument chemistry analyzers" – such as chromatography, immunoassay, or mass spectrometry.

57.    As a result, a healthcare provider billing for drug screening using CPT code 80307 thereby represents that it used "instrument chemistry analyzers" when providing the billed-for drug screens.

58.    However, to the extent that Pasi and Advanced Pain provided any drug screens at all in the claims identified in Exhibit "2", those screens involved in-office "dipstick" testing, and did not involve the use of any "instrument chemistry analyzers" such as chromatography, immunoassay, or mass spectrometry.

59.	Pasi and Advanced Pain's billing for urine drug screens under CPT code 80307 falsely represented that the drug screens had involved the use of "instrument chemistry analyzers", when in fact they had not.

60.	Pasi and Advanced Pain falsely represented that their purported urine drug screens involved the use of "instrument chemistry analyzers" because urine drug screens involving the use of "instrument chemistry analyzers" are reimbursable at higher rates than urine drug screens that do not involve the use of "instrument chemistry analyzers".

132.	In the claims identified in Exhibit "2", Pasi and Advanced Pain misrepresented the nature, extent, and medical necessity of their drug screens in this manner so that the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, maximize the amount of fraudulent billing they could submit to GEICO, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

**D.	The Fraudulent Prescriptions and Charges for Topical Pain Products by Apex Spine and Bendiks**

61.	In the claims identified in Exhibit "1", at the conclusion of their putative initial examinations, Apex Spine and Bendiks purported to prescribe and provide medically unnecessary and inappropriate topical pain management creams such as Ketoprofen cream to most of the Claimants, purportedly to treat the Claimants' pain symptoms.

62.	In keeping with the fact that the topical pain products were medically unnecessary and inappropriate, Apex Spine and Bendiks failed to document a detailed medical history of the Claimants to whom they prescribed the products.

45

63. Prescribing a pharmaceutical product without first taking a detailed patient history demonstrates a gross indifference to patient health and safety, as Apex Spine and Bendiks often did not know whether the Claimant was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

64. Additionally, Apex Spine and Bendiks also failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a topical pain product such as Ketoprofen cream.

65. Apex Spine and Bendiks also failed to document in their follow-up examination reports whether the topical cream that was prescribed to a particular Claimant and dispensed was actually used by the Claimant.

66. Apex Spine and Bendiks also routinely failed to document in their follow-up examinations whether the topical cream provided any relief to the Claimants or whether the Claimants experienced any side effects associated with the prescribed pharmaceutical product.

67. Notably, each year in the United States, approximately 4,500,000 ambulatory care visits and 100,000 deaths occur because of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.

68. Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class, which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

69. Despite the risks of therapeutic duplication, Apex Spine and Bendiks prescribed multiple topical pain management creams from the same therapeutic class, on the same date to a single Claimant, or they prescribed the topical pain management cream to the Claimants without

regard for whether the Claimants were already taking a drug from the same therapeutic class as the drug prescribed by Apex Spine and Bendiks.

70.     In the claims identified in Exhibit "1", Apex Spine and Bendiks misrepresented the medical necessity and propriety of the topical creams they prescribed and provided to Claimants, so that the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, maximize the amount of fraudulent billing they could submit to GEICO, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

**E.     The Defendants' Fraudulent Charges for Follow-Up Examinations**

133.     Apex Spine, Bendiks, Advanced Pain, and Pasi typically purported to subject the Claimants in the claims identified in Exhibits "1" – "2" to multiple fraudulent follow-up examinations during the course of the Defendants' fraudulent treatment and billing protocol.

134.     In the claims identified in Exhibit "1", Bendiks purported to perform the majority of the putative follow-up examinations at Apex Spine, and billed for the examinations using CPT codes 99213 and 99214, typically resulting in a charge of $577.50 for each purported follow-up examination when billed under CPT Code 99213, and $682.50 for each purported follow-up examination when billed under CPT Code 99214.

135.     In the claims identified in Exhibit "2", Pasi purported to perform the majority of the putative follow-up examinations at Advanced Pain, and billed for the examinations using CPT code 99214, typically resulting in a charge of $499.00 for each purported follow-up examination.

136.     In the claims for follow-up examinations identified in Exhibits "1" – "2", the Defendants' bills for their purported follow-up examinations – and the accompanying reports of

the examinations – were fraudulent in that they misrepresented the extent, nature, results, and medical necessity of the examinations, as well as the Claimants' conditions, and that the underlying examinations were lawfully provided and entitled to reimbursement.

**1.      Misrepresentations Regarding the Severity of the Claimants' Presenting Problems**

137.    For instance, in the claims for follow-up examinations that are identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely misrepresented the severity of the Claimants' presenting problems.

138.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically required that the patient present with problems of moderate to high severity.

139.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up examination.

140.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the

medication. (Neurology)

(vi)     Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)     Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)     Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

141.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

142.     Similarly, pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

143.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

144.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

49

(iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

145.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

146.    By contrast, and as set forth above, to the extent that the Claimants in the claims identified in Exhibits "1" – "2" suffered any injuries at all in their relatively minor automobile accidents, the injuries generally were minor soft tissue injuries such as sprains and strains, which were of minimal severity at the outset and improved over time.

147.    By the time the Claimants in the claims identified in Exhibits "1" – "2" presented to Apex Spine, Bendiks, Advanced Pain, and Pasi for the putative follow-up examinations, the Claimants either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were generally minimal.

148.    Even so, in the claims for follow-up examinations identified in Exhibit "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely billed for their putative follow-up examinations under CPT codes 99213 and/or 99214, and thereby falsely represented that the Claimants continued to suffer from presenting problems of low to moderate or moderate to high

severity, despite the fact that the purported examinations were provided many months after the Claimants' relatively minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the relatively minor automobile accidents would have resolved.

149. For example:

(i) On August 21, 2020, a Claimant named GC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GC's vehicle was drivable following the accident. In keeping with the fact that GC was not seriously injured, when GC presented later that same day to Betsy Johnson Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of GC on February 2, 2021 – over five months after the accident – Advanced Pain and Pasi billed for the follow-up examination using CPT code 99214, and thereby falsely represented that BF presented with problems of moderate to high severity.

(ii) On September 28, 2020, a Claimant named JB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JB's vehicle was drivable following the accident. In keeping with the fact that JB was not seriously injured, JB did not visit any hospital emergency room following the accident. To the extent that JB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JB on April 19, 2022 – over 18 months after the accident – Apex Spine and Bendiks billed for the follow-up examination using CPT code 99214, and thereby falsely represented that BF presented with problems of moderate to high severity.

(iii) On November 10, 2020, a Claimant named SC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured and did not complain of any pain. In keeping with the fact that SC was not seriously injured, SC did not visit any hospital emergency room following the accident. However, SC did self-present ten days later to WakeMed Hospital where she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that SC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SC on June 9, 2021 – nearly seven

months after the accident – Advanced Pain and Pasi billed for the follow-up examination using CPT code 99214, and thereby falsely represented that SC presented with problems of moderate to high severity.

(iv)     On December 27, 2020, a Claimant named SH was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SH's vehicle was drivable following the accident. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SH on October 4, 2021 – over nine months after the accident – Apex Spine and Bendiks billed for the follow-up examination using CPT code 99213, and thereby falsely represented that BF presented with problems of low to moderate severity.

(v)      On February 24, 2021, a Claimant named PM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain. In keeping with the fact that PM was not seriously injured in the accident, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PM on June 23, 2021 –nearly four months after the accident – Advanced Pain and Pasi billed for the follow-up examination using CPT code 99214, and thereby falsely represented that PM presented with problems of moderate to high severity.

(vi)     On June 14, 2021, a Claimant named EC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain. In keeping with the fact that EC was not seriously injured, EC did not visit any hospital emergency room following the accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EC on December 1, 2021 – nearly five months after the accident – Advanced Pain and Pasi billed for the follow-up examination using CPT code 99214, and thereby falsely represented that EC presented with problems of moderate to high severity.

(vii)    On June 21, 2021, a Claimant named DM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable following the accident. The police report further indicated that DM was not injured and did not complain of any pain. Nonetheless, DM presented later that same day to Cape Fear Valley Health Hospital where she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that DM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of DM on April 14, 2022 – nearly ten months after the accident – Apex Spine and Bendiks billed for the follow-up examination using CPT code 99214, and thereby falsely represented that DM presented with problems of moderate to high severity.

(viii)   On July 11, 2021, a Claimant named DM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable following the accident. The police report further indicated that DM was not injured and did not complain of any pain. In keeping with the fact that DM was not seriously injured in the accident, DM did not visit any hospital emergency room following the accident. To the extent that DM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of DM on January 17, 2022 – over six months after the accident – Advanced Pain and Pasi billed for the follow-up examination using CPT code 99214, and thereby falsely represented that DM presented with problems of moderate to high severity.

(ix)     On September 15, 2021, a Claimant named JI was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JI's vehicle was drivable following the accident. In keeping with the fact that JI was not seriously injured, JI did not visit any hospital emergency room following the accident. To the extent that JI experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JI on March 4 2022 – over five months after the accident – Apex Spine and Bendiks billed for the follow-up examination using CPT code 99213, and thereby falsely represented that JI presented with problems of low to moderate severity.

(x)      On July 29, 2022, a Claimant named KS was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. Nonetheless, KS presented later the next day to Southern Virginia Regional Medical Center where she was briefly observed on an outpatient

basis and released shortly thereafter with no serious injury diagnosis. To the extent that KS experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of KS on October 27, 2021 – nearly three months after the accident – Apex Spine and Bendiks billed for the follow-up examination using CPT code 99213, and thereby falsely represented that KS presented with problems of low to moderate severity.

150.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the Claimants presented with problems of low to moderate or moderate to high severity, when in fact the Claimants either did not have any genuine presenting problems at all as the result of their relatively minor automobile accidents at the time of the follow-up examinations – which often were many months after the minor accidents – or else their presenting problems were minimal.

151.    In the claims for follow-up examinations identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the Claimants presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99213 and/or 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

152.    In the follow-up examinations identified in Exhibits "1" – "2" Apex Spine, Bendiks, Advanced Pain, and Pasi also routinely falsely represented that the Claimants presented with problems of low to moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Claimants, so that the resulting bills and reports could be included in the Claimants' insurance payment Demands, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate

Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, including Shane Smith and Shane Smith Law.

**2.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

153.    Moreover, pursuant to the CPT Assistant, when Apex Spine, Bendiks, Advanced Pain, and Pasi submitted charges for the follow-up examinations under CPT codes 99214, they represented that they performed at least two of the following three components: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

154.    Similarly, when Apex Spine and Bendiks billed for their putative follow up examinations under CPT code 99213, they represented that the physicians or other healthcare practitioners who performed the examinations – typically Bendiks – performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

155.    In actuality, however, in the claims for follow-up examinations identified in in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

156.    Rather, following their purported follow-up examinations, Apex Spine, Bendiks, Advanced Pain, and Pasi simply reiterated the false, boilerplate "diagnoses" from the Claimants' initial examinations and recommended that the Claimants continue to receive additional, medically unnecessary Fraudulent Services.

157.    In keeping with the fact that the putative "results" of the follow-up examinations

were falsified to support continued, medically unnecessary treatments by the Defendants, and to provide a false justification for the medically unnecessary treatments that the Defendants already had purported to provide, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Claimants long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the relatively minor automobile accidents would have resolved.

158.    For example:

(i)     On February 10, 2020, a Claimant named HE was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HE's vehicle was drivable following the accident. The police report further indicated that HE was not injured and did not complain of any pain. Nonetheless, HE self-presented later that day to WakeMed Hospital where she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that HE experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HE on April 8, 2020 – nearly two months after the accident – Pasi and Advanced Pain falsely reported that HE continued to suffer from high levels of pain as the result of the minor accident, and recommended that HE return to Advanced Pain for the continued provision of the Fraudulent Services.

(ii)    On June 15, 2020, a Claimant named BF was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BF's vehicle was drivable following the accident. In keeping with the fact that BF was not seriously injured, BF did not visit any hospital emergency room following the accident. To the extent that BF experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of BF on October 4, 2021 – nearly four months after the accident – Bendiks and Apex Spine falsely reported that BF continued to suffer from high levels of pain as the result of the minor accident, and recommended that BF return to Apex Spine for the continued provision of the Fraudulent Services.

(iii)　On November 10, 2020, a Claimant named SC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SC's vehicle was drivable following the accident. The police report further indicated that SC was not injured and did not complain of any pain. In keeping with the fact that SC was not seriously injured, SC did not visit any hospital emergency room following the accident. However, SC did self-present ten days later to WakeMed Hospital where she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that SC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SC on June 9, 2021 – nearly seven months after the accident – Pasi and Advanced Pain falsely reported that SC continued to suffer from high levels of pain as the result of the minor accident, and recommended that SC return to Advanced Pain for the continued provision of the Fraudulent Services.

(iv)　On February 24, 2021, a Claimant named PM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured and did not complain of any pain. In keeping with the fact that PM was not seriously injured in the accident, PM did not visit any hospital emergency room following the accident. To the extent that PM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of PM on June 23, 2021 –nearly four months after the accident – Pasi and Advanced Pain falsely reported that PM continued to suffer from high levels of pain as the result of the minor accident, and recommended that PM return to Advanced Pain for the continued provision of the Fraudulent Services.

(v)　On June 14, 2021, a Claimant named EC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain. In keeping with the fact that EC was not seriously injured, EC did not visit any hospital emergency room following the accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EC on December 1, 2021 – nearly five months after the accident – Pasi and Advanced Pain falsely reported that EC continued to suffer from high levels of pain as the result of the minor accident, and recommended that EC return to Advanced Pain for the continued provision of the Fraudulent Services.

(vi)     On June 14, 2021, a Claimant named FC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FC's vehicle was drivable following the accident. The police report further indicated that FC was not injured and did not complain of any pain. In keeping with the fact that FC was not seriously injured, FC did not visit any hospital emergency room following the accident. To the extent that FC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of FC on August 13, 2021 – nearly two months after the accident – Pasi and Advanced Pain falsely reported that FC continued to suffer from high levels of pain as the result of the minor accident, and recommended that FC return to Advanced Pain for the continued provision of the Fraudulent Services.

(vii)    On June 21, 2021, a Claimant named DM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DM's vehicle was drivable following the accident. The police report further indicated that DM was not injured and did not complain of any pain. Nonetheless, DM presented later that same day to Cape Fear Valley Health Hospital where she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis.  To the extent that DM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of DM on April 14, 2022 – nearly ten months after the accident – Bendiks and Apex Spine falsely reported that DM continued to suffer from high levels of pain as the result of the minor accident, and recommended that DM return to Apex Spine for the continued provision of the Fraudulent Services.

(viii)   On July 21, 2022, a Claimant named GC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GC's vehicle was drivable following the accident. The police report indicated that GC was not injured and did not complain of any pain at the scene of the accident. Nonetheless, GC self-presented later that same day to Pitt County Memorial Hospital where he was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis.  To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of GC on October 19, 2022 – nearly three months after the accident – Bendiks and Apex Spine falsely reported that GC continued to suffer from high levels of pain as the result of the minor accident, and recommended that GC return to Apex Spine for the continued provision of the Fraudulent Services.

(ix)     On September 13, 2021, a Claimant named KM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KM's vehicle was drivable following the accident. The police report indicated that KM was not injured and did not complain of any pain at the scene of the accident. In keeping with the fact that KM was not seriously injured, KM did not present to any hospital emergency room immediately following the accident. To the extent that KM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of KM on January 11, 2022 – nearly four months after the accident – Bendiks and Apex Spine falsely reported that KM continued to suffer from high levels of pain as the result of the minor accident, and recommended that KM return to Apex Spine for the continued provision of the Fraudulent Services.

(x)     On December 6, 2021, a Claimant named MW was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MW's vehicle was drivable following the accident. In keeping with the fact that MW was not seriously injured, MW did not visit any hospital emergency room following the accident. To the extent that MW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MW on February 17, 2022 – over three months after the accident – Bendiks and Apex Spine falsely reported that MW continued to suffer from high levels of pain as the result of the minor accident, and recommended that MW return to Apex Spine for the continued provision of the Fraudulent Services.

159.     These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the Claimants continued to suffer from pain and other symptoms as the result of their relatively minor automobile accidents, often long after the minor accidents occurred.

160.     In the claims for follow-up examinations identified in in Exhibits "1" – "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely falsely represented that the Claimants continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, to support continued, medically unnecessary treatments by the Defendants, to provide a false justification for the medically unnecessary treatments that the

59

Defendants already had purported to provide, to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates.

**F.      The Fraudulent Charges for Electrodiagnostic Testing by Advanced Pain and Pasi**

161.      Based upon the fraudulent, pre-determined "results" of Advanced Pain and Pasi's initial and follow-up examinations, and pursuant to the Defendants' unlawful referral scheme, Advanced Pain and Pasi purported to subject many of the Claimants in the claims identified in Exhibit "2" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

162.      In the claims identified in Exhibit "2", Advanced Pain and Pasi then caused GEICO to be billed for the EDX tests under CPT Codes 95911 (for the NCV tests) and 95886 (for the EMG tests).

163.      In the claims for EDX tests identified in Exhibit "2", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the false, boilerplate "findings" and "diagnoses" that Advanced Pain and Pasi purported to provide during their initial and follow-up examinations, and the Defendants' unlawful referral scheme.

**1.      The Human Nervous System and Electrodiagnostic Testing**

164.      The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to

transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

165.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

166.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

167.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Advanced Pain and Pasi because they were medically necessary to determine whether the Claimants had radiculopathies.

168.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

169.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical

61

organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**2.      The Fraudulent NCV Tests**

170.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

171.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

172.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

173.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

174.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

175.    In order to extract the maximum billing out of each Claimant who supposedly received NCV tests, falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates, Advanced Pain and Pasi routinely purported to test far more nerves per patient than recommended by the Recommended Policy. In particular, Advanced Pain and Pasi routinely purported to perform and/or provide: (i) NCV tests of 4 or more motor nerves; (ii) NCV tests of 4-6 sensory nerves; as well as (iii) multiple H-Reflex studies.

176.    For example:

(i)     On March 19, 2020, Advanced Pain and Pasi purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and H-reflex studies to a Claimant named WI, supposedly to determine whether WI suffered from a radiculopathy.

(ii)    On December 28, 2020, Advanced Pain and Pasi purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and H-reflex studies to a Claimant named SC, supposedly to determine whether SC suffered from a radiculopathy.

(iii)   On March 4, 2021, Advanced Pain and Pasi purported to provide at least 2 motor nerve NCV tests, 2 sensory nerve NCV test of the lower extremities to a Claimant named RJ, then on March 8, 2021, Advanced Pain and Pasi purported to provide at least 2 motor nerve NCV tests, 3 sensory nerve NCV test of the upper extremities of RJ for a total of a test of at least 4 motor nerves and 5 sensory nerves over a period of four days, supposedly to determine whether RJ suffered from a radiculopathy.

(iv)    On July 12, 2021, Advanced Pain and Pasi purported to provide at least 2 motor nerve NCV tests, 2 sensory nerve NCV test of the lower extremities to a Claimant named KB, then on July 26, 2021, Advanced Pain and Pasi purported to provide at least 2 motor nerve NCV tests, 3 sensory nerve NCV test of the upper extremities of KB for a total of a test of at least 4 motor nerves and 5 sensory nerves over a period of two weeks, supposedly to determine whether KB suffered from a radiculopathy.

(v)    On October 7, 2021, Advanced Pain and Pasi purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and H-reflex studies to a Claimant named JV, supposedly to determine whether JV suffered from a radiculopathy.

177.    These are only representative examples. In the claims for NCV tests identified in Exhibit "2", Advanced Pain and Pasi routinely purported to perform and/or provide an excessive number of NCV tests to the Claimants, ostensibly to determine whether the Claimants suffered from radiculopathies, but actually to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates.

**3.    The Fraudulent EMG Tests**

178.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

179.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

180.    Advanced Pain and Pasi did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

181.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

182.    Even if there were any need for the EMG tests that Advanced Pain and Pasi purported to provide, and there was not, the nature and number of the EMGs that Advanced Pain and Pasi purported to provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

183.    For example:

(i)     On February 27, 2020, Advanced Pain and Pasi purported to provide a two-limb EMG to a Claimant named HE, along with an EMG test of the Rami nerve in HE's paraspinal muscle for a total of an EMG conducted on more than two limbs, supposedly to determine whether HE suffered from a radiculopathy.

(ii)    On June 22, 2021, Advanced Pain and Pasi purported to provide a two-limb EMG to a Claimant named JR, and then June 28, 2021, Pasi purported to provide JR with an additional two-limb EMG for a total of an EMG conducted on four limbs over a six-day span, supposedly to determine whether JR suffered from a radiculopathy.

(iii)   On August 3, 2021, Advanced Pain and Pasi purported to provide a two-limb EMG to a Claimant named CM, and then on August 30, 2021, Pasi purported to provide CM with an additional two-limb EMG for a total of an EMG conducted on four limbs in less than a one-month span, supposedly to determine whether CM suffered from a radiculopathy.

(iv)    On August 31, 2021, Advanced Pain and Pasi purported to provide a two-limb EMG to a Claimant named JD, and then on September 14, 2021, Pasi purported to provide JD with an additional two-limb EMG for a total of an EMG conducted on four limbs over a two-week span, supposedly to determine whether JD suffered from a radiculopathy.

(v)     On October 19, 2021, Advanced Pain and Pasi purported to provide a two-limb

65

EMG to a Claimant named EC, and then on October 25, 2021, Pasi purported to provide EC with an additional two-limb EMG for a total of an EMG conducted on four limbs in less than a one-week span, supposedly to determine whether EC suffered from a radiculopathy.

184.    These are only representative examples. In the EMG claims identified in Exhibit "2", Advanced Pain and Pasi routinely purported to provide and/or perform EMGs on muscles in more than two limbs and often in all four limbs of the Claimant solely to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates.

**4.    The Fraudulent Radiculopathy Diagnoses**

185.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

186.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Claimants whom Advanced Pain and Pasi purported to treat.

187.    As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

188.    As set forth above, the Claimants whom Advanced Pain and Pasi purportedly treated generally did not suffer any serious medical problems as the result of any automobile accident, much less any radiculopathies.

189. Even so, in the EMG and NCV claims identified in Exhibit "2", Advanced Pain and Pasi falsely purported to routinely identify radiculopathies in the Claimants to whom they purported to provide EMG and NCV testing.

190. Advanced Pain and Pasi purported to arrive at their pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide, falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates.

**G.** **The Defendants' Fraudulent Charges for Pain Management Injections**

191. As set forth in Exhibits "1" and "2", pursuant to and in furtherance of the Defendants' unlawful referral scheme, and based upon the false, boilerplate "diagnoses" that Apex Spine, Bendiks, Advanced Spine, and Pasi provided during their fraudulent examinations and/or EDX tests, the Defendants purported to subject many of the Claimants to a series of medically unnecessary pain management injections, including but not limited to medial branch blocks and facet injections, often purportedly performed under ultrasound guidance, fluoroscopic guidance, or with epidurography.

192. As set forth in Exhibits "1" and "2", Apex Spine, Bendiks, Advanced Spine, and Pasi then submitted the bills for the pain management injections to GEICO, or caused them to be submitted to GEICO, under CPT codes 64490, 64491, 64492, 64493, 64494, 64495.

193. Bendiks purported to personally administer the majority of the pain management injections in the claims identified in Exhibit "1" at Apex Spine.

194. Similarly, Pasi purported to personally administer the majority of the pain

management injections in the claims identified in Exhibit "2" at Advanced Pain.

195.    Like the charges for the other Fraudulent Services, the charges for the pain management injections identified in Exhibits "1" and "2" were fraudulent in that the injections were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the Defendants' unlawful referral scheme, and the phony, boilerplate "diagnoses" that Apex Spine, Bendiks, Advanced Pain, and Pasi provided to the Claimants at the conclusion of the putative examinations and/or EDX tests.

### 1.    Basic, Legitimate Use of Pain Management Injections

196.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

197.    Accordingly, in a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including pain management medication.

198.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

199.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all.

200.    In a legitimate clinical setting, pain management injections generally should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

201.    This is because: (i) properly administered pain management injections should

provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**2.      The Medically Unnecessary Pain Management Injections**

202.    As set forth above, the Claimants in the claims identified in Exhibits "1" and "2" were generally involved in relatively minor accidents.

203.    To the limited extent that the Claimants in the claims identified in Exhibits "1" and "2" experienced any injuries at all in their minor accidents, the injuries generally were minor soft tissue injuries such as sprains and strains.

204.    By the time the Claimants in the claims identified in Exhibits "1" and "2" presented to Apex Spine, Bendiks, Advanced Pain, and Pasi for treatment, they either had no presenting problems at all or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

205.    Even so, in the claims for pain management injections identified in Exhibits "1" and "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely purported to administer multiple, medically unnecessary pain management injections to Claimants within a span of weeks, either before they could have legitimately failed conservative treatment, or long after their symptoms – to the extent that they had any – had already long since resolved, despite the fact that such an injection regimen exposed the Claimants to considerable risk.

206.    For example:

(i)     On August 21, 2020, a Claimant named GC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GC's vehicle was drivable following the accident. In keeping with the fact that GC was not seriously injured, when GC presented later that same day to Betsy Johnson Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that GC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Advanced Pain and Pasi purported to provide GC with four medically unnecessary branch block injections on December 21, 2020 and four additional medically unnecessary branch block injections January 21, 2021, for a total of at least eight injections over a period of one month. In addition to being excessive and medically unnecessary, the last of the medically unnecessary injections was administered five months after GC's accident, long after any legitimate symptoms GC may have experienced as the result of the accident had resolved.

(ii)    On February 20, 2021, a Claimant named DC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DC's vehicle was drivable following the accident. The police report further indicated that DC was not injured and did not complain of any pain. In keeping with the fact that DC was not seriously injured in the accident, DC did not visit any hospital emergency room following the accident. To the extent that DC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Advanced Pain and Pasi purported to provide DC with four medically unnecessary median branch block injections on March 16, 2021, and four additional medically unnecessary median branch block injections on April 19, 2021. In addition to being excessive and medically unnecessary, the first of the injections were provided to DC less than one month after DC's relatively minor automobile accident, which is before DC could have legitimately failed conservative treatment.

(iii)   On March 17, 2020, a Claimant named GB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GB's vehicle was drivable following the accident. The police report further indicated that GB was not injured and did not complain of any pain. In keeping with the fact that GB was not seriously injured in the accident, GB did not visit any hospital emergency room following the accident. To the extent that GB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Advanced Pain and Pasi purported to provide GB with four medically unnecessary median branch block injections on August 18, 2020, and four additional medically unnecessary median branch block injections on October 5, 2020. In addition to being excessive and medically unnecessary, the last of the medically unnecessary

70

injections were administered over six months after GB's accident, long after any legitimate symptoms FP may have experienced as the result of the accident had resolved.

(iv)    On July 9, 2021, a Claimant named CM was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CM's vehicle was drivable following the accident. In keeping with the fact that CM was not seriously injured in the accident, when CM presented later that same day to Wayne Memorial Hospital, she was briefly observed on an outpatient basis and released shortly thereafter with no serious injury diagnosis. To the extent that CM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and improved over time. Even so, Advanced Pain and Pasi purported to provide CM with three medically unnecessary cervical median branch block injections on August 3, 2021, an additional four cervical median branch block injections on August 30, 2021, as well as two occipital nerve block injections on August 30, 2021, for a total of nine injections over the span of less than one month. In addition to being excessive and medically unnecessary, the first of the medically unnecessary injections were provided to CM less than one month after CM's relatively minor automobile accident, which is before CM could have legitimately failed conservative treatment.

(v)    On August 5, 2021, a Claimant named FP was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that FP's vehicle was drivable following the accident. In keeping with the fact that FP was not seriously injured, FP did not visit any hospital emergency room following the accident. To the extent that FP experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Apex Spine and Bendiks purported to provide FP with at least eight medically unnecessary medial branch block and facet injections on April 12, 2022. In addition to being excessive and medically unnecessary, the medically unnecessary injections were administered over eight months after FP's accident, long after any legitimate symptoms FP may have experienced as the result of the accident had resolved.

(vi)    On September 3, 2021, a Claimant named TB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TB's vehicle was drivable following the accident. The police report further indicated that TB was not injured and did not complain of any pain. In keeping with the fact that TB was not seriously injured, TB did not visit any hospital emergency room following the accident. To the extent that TB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Apex Spine and Bendiks purported to provide TB with multiple medically unnecessary facet joint

injections on January 25, 2022 and May 17, 2022, for a total of at least 12 injections provided over a period of less than four months. In addition to being excessive and medically unnecessary, the last of the medically unnecessary injections was administered over eight months after TB's accident, long after any legitimate symptoms TB may have experienced as the result of the accident had resolved.

(vii)   On November 10, 2021, a Claimant named HT was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HT's vehicle was drivable following the accident. The police report further indicated that HT was not injured and did not complain of any pain. In keeping with the fact that HT was not seriously injured, HT did not visit any hospital emergency room following the accident. To the extent that HT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Advanced Pain and Pasi purported to provide HT with multiple medically unnecessary medial branch block injections on November 22, 2021 and November 23, 2021, for a total of at least 14 injections over a period of less than two days. In addition to being excessive and medically unnecessary, the injections were provided to HT less than two weeks after HT's relatively minor automobile accident, which is before HT could have legitimately failed conservative treatment.

(viii)  On December 6, 2021, a Claimant named MW was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MW's vehicle was drivable following the accident. In keeping with the fact that MW was not seriously injured, MW did not visit any hospital emergency room following the accident. To the extent that MW experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Apex Spine and Bendiks purported to provide MW with at least four medically unnecessary lumbar facet block injections on April 5, 2022. In addition to being excessive and medically unnecessary, the medically unnecessary injections were administered nearly six months after MW's accident, long after any legitimate symptoms MW may have experienced as the result of the accident had resolved.

(ix)    On August 8, 2022, a Claimant named MB was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MB's vehicle was drivable following the accident. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Apex Spine and Bendiks purported to provide MB with six medically unnecessary bilateral facet injections on November 9, 2022. In addition to being excessive and medically unnecessary, the

last of the medically unnecessary injections was administered over three months after MB's accident, long after any legitimate symptoms MB may have experienced as the result of the accident had resolved.

(x) On December 3, 2022, a Claimant named TC was involved in a relatively minor automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that TC's vehicle was drivable following the accident. In keeping with the fact that TC was not seriously injured in the accident, TC did not visit any hospital emergency room following the accident. To the extent that TC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, Apex Spine and Bendiks purported to provide TC with multiple medically unnecessary bilateral facet joint injections and cervical medial branch block injections on February 15, 2023, for a total of at least six injections in a single day. In addition to being excessive and medically unnecessary, the first of the medically unnecessary injections were provided to TC approximately two months after TC's relatively minor automobile accident, which is before TC could have legitimately failed conservative treatment.

207. These are only representative examples. In the claims for pain management injections identified in Exhibits "1" and "2", Apex Spine, Bendiks, Advanced Pain, and Pasi routinely purported to provide medically unnecessary pain management injections to the Claimants, despite the fact that the Claimants had not suffered any injuries in their accidents that would warrant the injections.

## IV. The Defendants' Fraudulent and Unlawful Billing

208. The Defendants systematically caused hundreds of fraudulent and unlawful bills and treatment reports to be submitted to GEICO, containing hundreds of fraudulent charges, in order to create the illusion that the Claimants suffered from severe injuries, inflate Plaintiffs' payments on the Claimants' BI and UM claims, and thereby enrich the Defendants and their associates.

209. In the claims identified in Exhibits "1" and "2", the Defendants' bills and treatment reports were false and misleading in the following material respects:

73

(i)   The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants and their associates, including Shane Smith and Shane Smith Law, not to benefit the Claimants who supposedly were subjected to it.

(ii)  The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance.

(iii) The bills and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the Claimants' conditions, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and thereby enrich the Defendants and their associates.

## V.  GEICO's Injuries Are Directly Related to and a Natural Consequence of the Defendants' Fraudulent and Unlawful Scheme

210.  The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

211.  Even so, the Defendants systematically created fraudulent bills and treatment reports as set forth herein, and caused them to be submitted to GEICO as a part of, and in support of, fraudulent Demands.

212.  For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Claimants who supposedly were subjected to it.

213.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently were never performed in the first instance.

214.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal referral scheme.

215.    GEICO is under statutory and contractual obligations to promptly and fairly process and reasonably settle claims, and faces significant liability if it does not promptly and fairly process and reasonably settle claims. The facially–valid bills and treatment reports that the Defendants caused to be submitted to GEICO were designed to and did cause GEICO to rely upon them.

216.    As discussed above, the object of the Defendants' scheme was to enrich the Defendants by causing GEICO to rely on their fraudulent documentation and bills, thereby incurring damages by agreeing to settle BI and UM claims that otherwise would not have been settled, or by paying substantially more to settle BI and UM Claims than it would have had it known the Defendants' bills and supporting documentation were fraudulent. GEICO was the target of Defendants' scheme, and the damages incurred by GEICO was the direct result and natural consequence of the scheme.

217.    By reason of the Defendants' scheme, GEICO has incurred damages of more than $2,800,000.00 million in settling the BI and UM Claims at issue. GEICO was the target of Defendants' scheme and its damages are directly related to and a natural consequence of the scheme. As a result, GEICO is entitled to more than $2,800,000.00 in damages, or to a lesser amount to be proven at trial, but no less than the amount Defendants actually received as a result of the scheme.

218.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Bendiks
### (Violation of RICO, 18 U.S.C. § 1962(c))

219.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

220.    Apex Spine is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

221.    Bendiks knowingly conducted and/or participated, directly or indirectly, in the conduct of Apex Spine's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails, and violations of the federal wire fraud statute 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit, or cause to be submitted, hundreds of fraudulent bills and treatment reports on a continuous basis for over two years that: (i) falsely represented that the Fraudulent Services were medically necessary and, in many cases, falsely represented that the Fraudulent Services actually were performed in the first instance; (ii) misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance; and (iii) misrepresented and exaggerated the Claimants' conditions, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and

thereby enrich the Defendants and their associates. This, in turn, caused GEICO to issue settlement payments via the United States mails. The fraudulent charges, corresponding mailings, and wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

222.     Apex Spine's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which Bendiks has operated Apex Spine, inasmuch as Apex Spine is not engaged in a legitimate medical practice, and acts of mail fraud and wire fraud therefore are essential in order for Apex Spine to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that Bendiks continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Apex Spine to the present day.

223.     Apex Spine is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers in North Carolina. These inherently unlawful acts are taken by Apex Spine in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent insurance billing.

224.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,500,000.00 pursuant to the fraudulent bills submitted through Apex Spine, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme.

225.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SECOND CAUSE OF ACTION**
**Against Bendiks**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

226.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

227.    Apex Spine is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

228.    Bendiks is employed by and/or associated with the Apex Spine enterprise.

229.    Bendiks – together with Shane Smith and Shane Smith Law – knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Apex Spine enterprise's affairs, through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails, and violations of the federal wire fraud statute 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit, or cause to be submitted, hundreds of fraudulent bills and treatment reports on a continuous basis for over two years that: (i) falsely represented that the Fraudulent Services were medically necessary and, in many cases, falsely represented that the Fraudulent Services actually were performed in the first instance; (ii) misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance; and (iii) misrepresented and exaggerated the Claimants' conditions, in order to falsify and exaggerate the

78

severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and thereby enrich the Defendants and their associates. This, in turn, caused GEICO to issue settlement payments via the United States mails. The fraudulent charges, corresponding mailings, and wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing and wire transmission was made in furtherance of the mail fraud and wire fraud scheme.

230.     Bendiks knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

231.     GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,500,000.00 pursuant to the fraudulent bills submitted through Apex Spine, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme.

232.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Apex Spine and Bendiks**
**(Common Law Fraud)**

233.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

234. Apex Spine and Bendiks intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

235. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", falsely representing that the Fraudulent Services were medically necessary; (ii) in many of the claims identified in Exhibit "1", falsely representing that the Fraudulent Services were legitimately performed; (iii) in every claim identified in Exhibit "1", falsely representing the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance; and (iv) in every claim identified in Exhibit "1", falsely representing the Claimants' conditions, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and thereby enrich the Defendants and their associates.

236. Apex Spine and Bendiks intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to make payments to Apex Spine and Bendiks or for their benefit.

237. GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,500,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by Apex Spine and Bendiks to GEICO.

238. Apex Spine and Bendiks's conduct was malicious, fraudulent, and willful and wanton.

239.    As a result of Apex Spine and Bendiks' malicious, fraudulent, and willful and wanton conduct, GEICO is entitled to punitive damages.

**FOURTH CAUSE OF ACTION**
**Against Apex Spine and Bendiks**
**(Unjust Enrichment)**

240.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

241.    As set forth above, Apex Spine and Bendiks have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

242.    GEICO conferred a benefit upon Apex Spine and Bendiks by paying over $1,350,000.00 to settle the BI and UM claims at issue, and Apex Spine and Bendiks' fraudulent bills and supporting documentation were at the very least a substantial factor in inducing GEICO to settle BI and UM Claims it otherwise would not have settled, and pay substantially more to settle BI and UM Claims than it would have had it known the bills and documentation were fraudulent.

243.    The money Apex Spine and Bendiks obtained in connection with GEICO's settlement payments on the BI and UM Claims at issue in equity and good conscience belongs to and should be returned to GEICO.

244.    Apex Spine and Bendiks have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that was not gratuitous, which Apex Spine and Bendiks voluntarily and consciously accepted notwithstanding their improper, unlawful, and unjust billing scheme.

245.    Apex Spine and Bendiks's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

246.    Further, the benefit which GEICO conferred upon Apex Spine and Bendiks was measurable, in fact, Apex Spine and Bendiks have been unjustly enriched by more than $1,500,000.00, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme.

**FIFTH CAUSE OF ACTION**
**Against Pasi**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

247.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

248.    Advanced Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

249.    Pasi knowingly conducted and/or participated, directly or indirectly, in the conduct of Advanced Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails, and violations of the federal wire fraud statute 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit, or cause to be submitted, hundreds of fraudulent bills and treatment reports on a continuous basis for over two years that: (i) falsely represented that the Fraudulent Services were medically necessary and, in many cases, falsely represented that the Fraudulent Services actually were performed in the first instance; (ii) misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance; and (iii) misrepresented and exaggerated the Claimants' conditions, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and

thereby enrich the Defendants and their associates. This, in turn, caused GEICO to issue settlement payments via the United States mails. The fraudulent charges, corresponding mailings, and wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

250. Advanced Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which Pasi has operated Advanced Pain, inasmuch as Advanced Pain is not engaged in a legitimate medical practice, and acts of mail fraud and wire fraud therefore are essential in order for Advanced Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that Pasi continues to submit fraudulent billing to GEICO, and continues to attempt collection on the fraudulent billing submitted through Advanced Pain to the present day.

251. Advanced Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers in North Carolina. These inherently unlawful acts are taken by Advanced Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent insurance billing.

252. GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,350,000.00 pursuant to the fraudulent bills submitted through Advanced Pain, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme.

253. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Pasi
### (Violation of RICO, 18 U.S.C. § 1962(d))

254. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

255. Advanced Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

256. Pasi is employed by and/or associated with the Advanced Pain enterprise.

257. Pasi – together with Shane Smith and Shane Smith Law – knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Advanced Pain enterprise's affairs, through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails, and violations of the federal wire fraud statute 18 U.S.C. § 1343, based upon the use of the wires in interstate commerce to submit, or cause to be submitted, hundreds of fraudulent bills and treatment reports on a continuous basis for over two years that: (i) falsely represented that the Fraudulent Services were medically necessary and, in many cases, falsely represented that the Fraudulent Services actually were performed in the first instance; (ii) misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance; and (iii) misrepresented and exaggerated the Claimants' conditions, in order to falsify

and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and thereby enrich the Defendants and their associates. This, in turn, caused GEICO to issue settlement payments via the United States mails. The fraudulent charges, corresponding mailings, and wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing and wire transmission was made in furtherance of the mail fraud and wire fraud scheme.

258.    Pasi knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

259.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,350,000.00 pursuant to the fraudulent bills submitted through Advanced Pain, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme.

260.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Advanced Pain and Pasi**
**(Common Law Fraud)**

261.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

262.    Advanced Pain and Pasi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

263.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", falsely representing that the Fraudulent Services were medically necessary; (ii) in many of the claims identified in Exhibit "2", falsely representing that the Fraudulent Services were legitimately performed; (iii) in every claim identified in Exhibit "2", falsely representing the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, the reimbursable amounts for the Fraudulent Services, and that the Fraudulent Services were lawfully provided and entitled to payment in the first instance; and (iv) in every claim identified in Exhibit "2", falsely representing the Claimants' conditions, in order to falsify and exaggerate the severity of the Claimants' injuries, inflate Plaintiffs' payments on BI and UM Demands, and thereby enrich the Defendants and their associates.

264.    Advanced Pain and Pasi intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to make payments to Advanced Pain and Pasi or for their benefit.

265.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,350,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by Advanced Pain and Pasi to GEICO.

266.    Advanced Pain and Pasi's conduct was malicious, fraudulent, and willful and wanton.

267.    As a result of Advanced Pain and Pasi' malicious, fraudulent, and willful and wanton conduct, GEICO is entitled to punitive damages.

**EIGHTH CAUSE OF ACTION**
**Against Advanced Pain and Pasi**
**(Unjust Enrichment)**

268.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 217 above.

269.    As set forth above, Advanced Pain and Pasi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

270.    GEICO conferred a benefit upon Advanced Pain and Pasi by paying over $1,350,000.00 to settle the BI and UM claims at issue, and Advanced Pain and Pasi' fraudulent bills and supporting documentation were at the very least a substantial factor in inducing GEICO to settle BI and UM Claims it otherwise would not have settled, and pay substantially more to settle BI and UM Claims than it would have had it known the bills and documentation were fraudulent.

271.    The money Advanced Pain and Pasi obtained in connection with GEICO's settlement payments on the BI and UM Claims at issue in equity and good conscience belongs to and should be returned to GEICO.

272.    Advanced Pain and Pasi have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that was not gratuitous, which Advanced Pain and Pasi voluntarily and consciously accepted notwithstanding their improper, unlawful, and unjust billing scheme.

273.    Advanced Pain and Pasi's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

274.    Further, the benefit which GEICO conferred upon Advanced Pain and Pasi was measurable, in fact, Advanced Pain and Pasi have been unjustly enriched by more than $1,350,000.00, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme.

## JURY DEMAND

275.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Bendiks, compensatory damages in favor of GEICO in excess of $1,500,000.00, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

B.    On the Second Cause of Action against Bendiks, compensatory damages in favor of GEICO in excess of $1,500,000.00, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Apex Spine and Bendiks, compensatory damages in favor of GEICO in excess of $1,500,000.00, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Cause of Action against Apex Spine and Bendiks, compensatory damages in favor of GEICO in excess of $1,500,000.00, or to a lesser amount to be proven at trial, but no less than the amount Apex Spine and Bendiks actually received as a result of the scheme, plus costs and interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Pasi, compensatory damages in favor of GEICO in excess of $1,350,000.00, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against Pasi, compensatory damages in favor of GEICO in excess of $1,350,000.00, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Advanced Pain and Pasi, compensatory damages in favor of GEICO in excess of $1,350,000.00, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

H.      On the Eighth Cause of Action against Advanced Pain and Pasi, compensatory damages in favor of GEICO in excess of $1,350,000.00, or to a lesser amount to be proven at trial, but no less than the amount Advanced Pain and Pasi actually received as a result of the scheme, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: September 18, 2023

By: _Savannah E. Lavender_
Savannah E. Lavender, Esq.
NC Bar No. 57970
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
2235 Gateway Access Point
Suite 220
Raleigh, NC 27607
(984) 844-7900

*--and--*

Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Steven Henesy, Esq. (to be admitted *pro hac vice*)
Qasim I. Haq, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER, LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*